**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>MICHAEL NOBARI, EDDY A. GEORGE,<br>EDISON SHINO, RITO S. ZAZUETA,<br><br>                    Defendants. | **1:03-CR- 05453 OWW**<br><br>**STATEMENT OF DECISION AND**<br>**ORDER DENYING DEFENDANTS'**<br>**MOTIONS FOR NEW TRIAL** |

## I.   INTRODUCTION

Defendants Michael Nobari ("Nobari"), Eddy A. George ("George"), and Rito S. Zazueta ("Zazueta") each filed motions for a new trial.  Defendants Edison Shino ("Shino"), Nobari, and Zazueta each joined co-Defendants' motions for new trial.  The Government opposes all Defendants' motions.

## II.   PROCEDURAL BACKGROUND

Defendants were indicted by a grand jury for several violations under 21 U.S.C. §841 and under 18 U.S.C. 924(c). (Doc. 142, Indictment, Filed February 3, 2005.)  A verdict was returned against Defendants following a criminal jury trial on May 4, 2005.  (Doc. 235, Verdict as to Edison Shino, Filed May 4, 2005; Doc. 236, Verdict as to Eddy A. George, Filed May 4, 2005; Doc. 237, Verdict as to Rito S. Zazueta, Filed May 4, 2005; Doc. 238, Verdict as to Michael C. Nobari, Filed May 4, 2005).

**1**

1   Defendants' time to file a motion for new trial was extended to
2   February 2, 2006. (Doc. 290, Order, Filed December 13, 2005).
3   Defendant Michael C. Nobari filed a motion for a new trial on
4   January 3, 2006. (Doc. 292 SEALED, Motion for a New Trial, Filed
5   January 3, 2006.) Defendant Eddy George filed a motion for new
6   trial on February 2, 2006. (Doc. 294 SEALED, Motion for New
7   Trial, Filed February 2, 2006). Defendant Rito Zazueta also
8   filed a motion for a new trial on February 2, 2006. (Doc. 295
9   SEALED, Motion for New Trial, Filed February 2, 2006).
10  Defendants Michael C. Nobari, Edison Shino, and Rito Zazueta each
11  joined their co-Defendants' motions for new trial. (Doc. 296,
12  Motion for Joinder by Michael C. Nobari, Filed February 1, 2006;
13  Doc. 298, Motion for Joinder by Edison Shino, Filed February 1,
14  2006; Doc. 297, Motion for Joinder by Rito S. Zazueta, Filed
15  February 2, 2006.) The Government filed its opposition to
16  Defendant George's motion for a new trial on March 27, 2006.
17  (Doc. 305 SEALED, Government's Opposition to Defendant George's
18  Motion for a New Trial, Filed March 27, 2006.) The Government
19  also filed an opposition to Defendant Nobari's motion for a new
20  trial. (Doc. 306 SEALED, Government's Opposition to Defendant
21  Nobari's Motion for a New Trial, Filed March 27, 2006).

22              **III.   FACTUAL BACKGROUND**

23      A superceding indictment was filed on February 3, 2005
24  against all Defendants. (Doc. 142, Indictment, Filed February 3,
25  2005.) Count one of the indictment charged Defendants with
26  conspiring to aid and abet the manufacture of methamphetamine and
27  to possess pseudoephedrine. Count two of the indictment charged
28  Defendants with attempted possession of pseudoephedrine, a

**2**

chemical known or believed to be used to manufacture methamphetamine. (*Id.*)  Count three of the indictment charged Defendants with possession of a firearm in furtherance of a drug trafficking crime. (*Id.*)  Defendant Zazueta was also charged with a fourth count of being a deported alien found in the United States. (*Id.*)

The charges against Defendants arise out of negotiations between Defendant George and Fresno police undercover detective John Galvan to purchase pseudoephedrine for the manufacture of methamphetamine that began in November 2003. (Doc. 306 SEALED, Government's Opposition to Defendant Nobari's Motion for a New Trial, Filed March 27, 2006.)  The evidence at trial showed that Defendant George engaged in negotiations with Agent Galvan to purchase up to 200 cases of pseudoephedrine pills for $400,000. (*Id.*)  The evidence at trial also showed that Defendant George and Defendant Nobari met with Agent Galvan on November 20, 2003 and that Agent Galvan showed them 22 buckets of pseudoephedrine pills he had inside a rental truck driven to the meeting location by another undercover agent. (*Id.*)  Agent Galvan told George and Nobari that the price for each bucket was $10,000. (*Id.*)  According to the evidence, George and Nobari then told Agent Galvan that they would return with the money. (*Id.*)

George and Nobari then made several trips to Defendant Shino's residence during the course of the transaction with Agent Galvan on November 20, 2003. (*Id.*)  At one point, George and Nobari met with Agent Galvan to obtain a sample of the pills and then returned to Shino's residence where they met with Shino and Defendant Zazueta. (*Id.*)

**3**

1    The transaction between Defendants and Agent Galvan took

2  place in a McDonald's parking lot in the city of Turlock.  (*Id*.)

3  According to the evidence at trial, George and Nobari told Agent

4  Galvan that "George's Cousin" (Defendant Shino) would purchase

5  seven buckets and "the other guy" (Zazueta) coming with Shino

6  would purchase six.  When Zazueta and Shino arrived at the

7  McDonald's parking lot to meet with George and Nobari, the

8  evidence showed that Zazueta was armed with a loaded gun equipped

9  with a laser sight and that Shino handed George a bag full of

10 money.  (*Id*.)  When Agent Galvan and George were conducting the

11 transaction in George's Honda Civic, there was a loaded handgun

12 registered to Defendant Nobari under the floor mat of the right

13 passenger seat where George was seated.

14    At trial, the jury was presented with a tape recording of

15 the transaction where Defendants refer to themselves as Middle-

16 Easterners in terms of race.  For example the jury heard a tape

17 recording of the transaction with Agent Galvan, in which George

18 refers to Zazueta as "the Mexican guy."  (Gov. Ex. 1-c-2 at 20).

19 After a ten day jury trial that concluded in May 2005, the jury

20 found the Defendant Shino and Defendant George guilty on counts

21 one and two of conspiracy to aid and abet the manufacture of

22 methamphetamine, and attempted possession of pseudoephedrine.

23 Defendants Nobari and Zazueta were found guilty on all counts,

24 including using or carrying a firearm in relation to a drug

25 trafficking offense.

26            **IV.   <u>STANDARD OF REVIEW</u>**

27    Rule 33 of the Federal Rules of Criminal Procedure states

28 that the trial court may grant a Defendants' motion for a new

**4**

1  trial "if the interest of justice so requires." Fed. R. Crim. P.

2  33(a).   Rule 33 gives the court "broad discretion. . . to set

3  aside a jury verdict and order a new trial to avert a perceived

4  miscarriage of justice." *Id.*   The court is not obliged to view

5  the evidence in the light most favorable to the verdict, and it

6  is free to weigh the evidence and evaluate for itself the

7  credibility of the witnesses. *United States v. Kellington,* 217

8  F.3d 1084, 1097 (9th Cir. 2000) (citations omitted).   If the

9  court concludes that, despite the abstract sufficiency of the

10  evidence to sustain the verdict, the evidence preponderates

11  sufficiently heavily against the verdict such that a serious

12  miscarriage of justice may have occurred, it may set aside the

13  verdict, grant a new trial, and submit the issues for

14  determination by another jury.   *Id.* (citations omitted).

15                                    **V.   DISCUSSION**

16  **A.   Prosecutorial Misconduct For Statements Made During Trial**

17        A claim of prosecutorial misconduct must be evaluated in the

18  entire context of the trial. *United States v. Cabrera,* 201 F.3d

19  1243, 1246 (9th Cir. 2000) (citations omitted).   Reversal on this

20  basis is justified only if it appears more probable than not that

21  the prosecutorial misconduct materially affects the fairness of

22  the trial.   *Id.*   In making this assessment, a court looks to

23  several factors, not only the impact of the prosecutor's remarks,

24  but also Defense counsel's opening salvo. *United States v.*

25  *Weatherspoon*, 410 F.3d 1142, 1150 (9th Cir. 2005); *see also*

26  *United States v. Young,* 470 U.S. 1, 12-13 (1985).   If the

27  prosecutor's remarks were "invited," and did no more than respond

28  substantially in order to "right the scale," such comments would

                                     **5**

1   not warrant reversing a conviction.  *Young,* 470 U.S. at 12-13.

2        The substance of any curative instruction and the closeness

3   of the case may also be a factor in considering a claim of

4   prosecutorial misconduct.  *United States v. Brown,* 327 F.3d 867,

5   871 (9th Cir. 2003).  In evaluating such allegations, it is not

6   enough that the prosecutor's remarks were undesirable or even

7   universally condemned.  *Tak Sun Tan v. Runnels,* 413 F.3d 1101,

8   1112 (9th Cir. 2005).  Another factor is the strength of the case

9   against a defendant.  *Weatherspoon*, 410 F.3d at 1151.  When the

10  case is particularly strong, the likelihood that prosecutorial

11  misconduct will affect the defendant's substantial rights is

12  lessened because the jury's deliberations are less apt to be

13  influenced.  *Id.*  But as the case becomes progressively weaker,

14  the possibility of prejudicial effect grows correspondingly.  *Id.*

15  **B.    Harmless Error Standard**

16       Where Defense counsel objected to acts of alleged

17  prosecutorial misconduct at trial, we review for harmless error.

18  *Cabrera,* 201 F.3d at 1246.  Under harmless error review, Federal

19  Rule of Criminal Procedure 52(a) states that any error, defect,

20  irregularity, or variance that does not affect substantial rights

21  must be disregarded.  Fed. R. Crim. P. 52(a).  Where an error is

22  non constitutional it may be reversed if it is "more probable

23  than not" that the error did not materially affect the verdict.

24  *United States v. Perlaza,* 439 F.3d 1149, 1171 (9th Cir. 2004).

25  Where an error is of constitutional dimensions, the error must be

26  harmless beyond a reasonable doubt.  *Id.*  A specific analysis of

27  the trial record determines whether the error was prejudicial.

28  *Olano v. United States,* 507 U.S. 725, 734 (1993).  The Government

**6**

bears the burden of persuasion in showing that there was no prejudicial effect by the alleged prosecutorial misconduct. *See id.* Defendants each raise several instances of alleged prosecutorial misconduct previously objected to during trial.

### i.   Prosecutor's Closing Argument

The prosecution is allowed "a degree of latitude in the presentation of their closing summations," including "the freedom to strike hard blows based on the evidence and all fair inferences therefrom." *United States v. Velarde-Gomez,* 224 F.3d 1062, 1072 (9th Cir. 2000).  There is no reversible error unless misconduct in the summation was so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge. *Id.*  The issue is whether the Prosecutor delivered such a strongly worded closing that the argument amounted to foul blows. *Id.*

### a.   Escobar's Reference to Race During Her Closing Argument

Defense counsel for George argues that the prosecution engaged in racial and ethnic stereotyping by making the following comments during closing argument:

> MS. ESCOBAR: Red herring number two. Racial and ethnic profiling. There was no racial or ethnic profiling in this case, ladies and gentlemen.  The defense is playing the race card for the sole purpose of trying to inflame you.  The DEA's mission is not to target Assyrian drug dealers who want to buy a house for their mom.  Their mission, the DEA's mission is to target drug dealers, period.  As you know, and as George admits, George made the initial contact with law enforcement during the Chicago pseudoephedrine pill transaction.  There was no targeting whatsoever.  He initiated the contact. However, within the context of

**7**

1   methamphetamine manufacturing, the fact that
    George, Shino and Nobari happened to be
2   Assyrian, happened to be Middle Eastern is
    significant because, as you heard, [according
3   to DEA agent testimony] Middle Easterners
    typically occupy the role of pill broker and
4   are not involved in the actual manufacture of
    methamphetamine.  Within the context of
5   methamphetamine manufacturing, the role of
    obtaining pills for the manufacture of
6   methamphetamine is typically assumed by
    Mexicans.  In fact, as you heard in many of
7   the recordings, George himself talks about
    unloading the pills to the Mexicans, who in
8   his experience would take 50 cases at a time.
    During the drug deal at the McDonald's, it
9   was George who referred to Zazueta as "the
    Mexican who wanted the rest of the pills."
10  This talk about race is a classic red
    herring.  Don't buy it. The fact is Zazueta
11  is a Hispanic drug dealer.  I am a Hispanic
    prosecutor. My grandmother happens to be
12  Columbian.  We both made our own choices,
    ladies and gentlemen.  Race has nothing to do
13  with the prosecution of this case.

14      MR. REYES: Objection. We object to the
        prosecutor's reference to heritage.
15

16  The court responded and provided the following curative

17  instruction to the jury:

18      THE COURT: The objection is overruled.
        Remember, ladies and gentlemen, to rely on
19      what is in evidence and in this case, the
        reference as to the prosecutor's heritage is
20      not in evidence and therefore you should not
        treat that as having been proved.  Beyond
21      that there is no reference to nor implied
        support of any party or witness in this case
22      by that reference and the jury should
        therefore disregard it.  You may continue.
23

24  RTP, May, 3, 2005, 1460:12 - 1462:1.

25      Defendants cite to several cases to support their argument.

26  The first case is *Bains v. Cambra*, 204 F.3d 964 (9th Cir. 2000).

27  In *Bains*, the Defendant, who was Sikh, appealed a district

28  court's denial of his habeas corpus petition.  *Bains*, 204 F.3d at

**8**

1  967.  The Ninth Circuit reversed, stating that Defendant was

2  prejudiced by testimony and closing arguments made during trial.

3  *Id.* at 974.  Specifically, a significant portion of the

4  Prosecutor's argument highlighted the relevant testimony in a way

5  that went beyond merely providing evidence of motive and intent.

6  *Id.*  The Prosecutor relied on arguments showing all Sikh persons

7  are irresistibly predisposed to violence when a family member has

8  been dishonored and also are completely unable to assimilate to

9  and abide by the laws of the United States.  *Id.* at 975.  The

10 fact that much evidence already had been permissibly introduced

11 to show Bain's motive and intent did not alleviate the concerns.

12 *Id.*  Also, the danger of prejudice was further exacerbated by the

13 state trial court's reluctance to issue limiting instructions to

14 the jury.  *Id.*

15    Defendants also cite to *United State v. Vue*, 13 F.3d 1206

16 (8th Cir. 1994), which held that a customs agent's testimony

17 about the tendency of Hmong people to smuggle opium into the Twin

18 cities was reversible error.  *Vue*, 13 F.3d at 1212-13.  In *Vue,* a

19 Government's witness provided testimony during his direct exam

20 that, based on his experience, 95 percent of opium smuggling

21 cases in the Twin Cities area of Minnesota were related to Hmong

22 individuals.  *Id.* at 1212.  The court reasoned that it could not

23 find the interjection of race in the trial testimony as harmless

24 beyond a reasonable doubt because such testimony clearly invited

25 the jury to put the Vues' racial and cultural background into the

26 balance in determining Defendant's guilt.  *Id.* at 1213.

27    Lastly, Defendants cite to *United States v. Doe*, 903 F.2d

28 16, 20 (D.C. Cir. 1990), which held that references to the

**9**

defendant as "the Dominican" and DEA agent's testimony about a New York City neighborhood where drug transactions took place as having a very high Hispanic population were reversible error.

The present case, however, is more analogous to *United States v. Santiago*, 46 F. 3d 885 (9th Cir. 1995). Defendant Santiago appealed his conviction alleging that the Government violated his equal protection rights under the Fifth Amendment by injecting the issue of ethnicity into the trial. *Santiago*, 46 F. 3d at 890. Specifically, Defendant charged that the term "Mexican Mafia" along with testimony during trial about the Hispanic population. *Id.* The Ninth Circuit rejected the argument that there was an Equal Protection violation during trial. *Id.* It noted that the core concern is whether the argument shifts its emphasis from evidence to emotion. *Id.* at 891. It further stated that if the prosecution's case, overall, was a dispassionate and intelligent presentation of evidence, the relevant use of a racial term is less likely to prejudice the outcome. *Id.*

Contrary to *Bains,* the Prosecutor's argument in this case did not go beyond the evidence or draw inferences between the facts presented and the Government's case in chief. In the present case, race and the term "Mexican" is first raised by Attorney Reyes, counsel for Zazueta. RTP, April 19, 2005, 158:4-5. Further, Defendants in their conversations specifically referred to each other as Middle-Eastern and claimed comradeship based on such ethnicity. For example, throughout the trial, the jury heard audio tapes of negotiations for the purchase of up to 200 cases of pseudoephedrine in which co-Defendants refer to each

**10**

other by ethnic terms rather than by names.  The use of ethnic
terms was necessary to identify for the jury which Defendant was
referred to as "The Mexican" in the audio tapes received in
evidence.  The evidence at trial revealed that George referred to
Zazueta as "The Mexican."

Also, unlike *Vue,* the Prosecutor does not generalize Mexican
people as being responsible for the problem of methamphetamine
trafficking.  The Prosecutor rather cautioned throughout her
opening statement that reference to "Mexican" is only a statement
of fact not intended to be inflammatory or to affect the
deliberations.  RTP, April 20, 2005, 225:7-20.  The Prosecutor
presented such evidence which was introduced by the Defendants as
a part of how they referred to each other, in a dispassionate
manner without appealing to emotion.  The Prosecution's evidence
of such references was the Defendants' own words during the
transactions and her closing argument did not amount to "foul
blows."

Any conceivable negative innuendo did not approach the level
of potential prejudice.  The Defense made objections to the
Prosecution's comment which were ruled on and accompanied by a
curative instruction.  This curative instruction, coupled with
the strong case presented against Defendants, was sufficient to
neutralize any potential prejudice that might have arisen.  Any
alleged error is harmless beyond a reasonable doubt.

### b.   Impermissible Vouching

The Government is prohibited from vouching for the
credibility of its witnesses, its case, or the Prosecutor
herself: (1) by "placing the prestige of the government behind

**11**

the witness" through personal assurances; or (2) suggesting that information not presented to the jury supports the witness' testimony. *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005).  The second type of vouching involves prosecutorial remarks that bolster a witness' credibility by reference to matters outside the record. *United States v. Frederick,* 78 F.3d 1370, 1378 (9th Cir. 1996).  Such prosecutorial remarks may be fatal if the remarks, fairly construed, were based on the District Attorney's personal knowledge apart from the evidence in the case and that the jury might have so understood them. *Id.*

Defendants argue that the Prosecutor engaged in impermissible vouching when commenting on not being able to present evidence.  This statement was in response to Defense Attorney Nutall's[1] closing statement:

> But if that hadn't been flushed out, and fortunately it has been, or it came to naught.  I mean, it ended up against the wall.  It had no validity.  You would have been left with the thought that Eddy George had phone records that showed that he communicated with and associated with known drug traffickers, thereby giving the impression that he was a high level trafficker. And it wasn't there.  Now, this is what I mean about bearing false witness.

> MS. ESCOBAR: Your Honor, I'd like to note an objection to this entire argument.

> THE COURT: And the ground?

> MS. ESCOBAR: Had the government been able to present the evidence --

> MR. REYES: We object, Your Honor.

---

[1] Mr. Nuttal is also Eddy George's Attorney.

1
2
3

> THE COURT: All right. The objection is
> overruled.  The jury will remember what the
> evidence was at the time that concerned Jorge
> Padilla.

4   RTP, April 29, 2005, 1362:8-24.

5       The Prosecutor's comment does raise an inference that the

6   Government was privy to additional information regarding

7   Defendant George.  Her statement was objected to mid sentence,

8   before any reference to any inadmissible evidence was made.  The

9   Prosecutor's objection to Mr. Reyes' argument was overruled.  The

10  jury was given a curative instruction reminding them to consider

11  only the evidence presented at trial concerning Jorge Padilla.

12  Analysis of the harm caused by vouching depends on the closeness

13  of the case.  *Fredricks,* 78 F.3d at 1378.  Insufficient

14  information was referred to in argument to make the Prosecutor's

15  incomplete statement prejudicial.  Balancing the curative

16  instruction about the Prosecutor's comment coupled with the

17  strength of the overall evidence presented during trial against

18  the potential for prejudice, the Prosecutor's comment was not

19  prejudicial to Defendants' case.

20              **c.   Impermissible Disparaging of Defense Attorneys**

21      The Defense also argues that the Prosecutor engaged in

22  misconduct by making improper comments about Defense counsel.

23  Defendants allege that the following comment amounted to a

24  personal attack:

25
26
27

> MS. ESCOBAR:  The defense attorneys have not
> only mischaracterized the law, they have also
> mischaracterized the evidence.  The defense
> tactics may be characterized in two words,
> ladies and gentlemen.

28

> MR. NUTTALL: Can we see what those two words

**13**

1          are?

2          MS. ESCOBAR: Red herring.  Red herring.
           Ladies and gentlemen, in oral argument, a red
3          herring is a tactic to divert your attention
           away from the truth.  The basic idea is to
4          win an argument by leading attention away
           from the argument to another topic.  The term
5          has interesting historical origins.  As I
           understand it, a herring turns red when it's
6          dried and smoked.  I've never had a red
           herring, but it's supposed to have a very
7          strong odor as well.  British fugitives in
           the 1800s would rub a red herring across
8          their trail in order to divert the
           bloodhounds that were in hot pursuit.  Well,
9          the defense has put forth some pretty smelly
           fish to distract you. To divert attention
10         away from --

11         MR. NUTTALL:  This is inappropriate. This is
           inappropriate commentary.

12
           MR. REYES:  Object to the big fish, Your
13         Honor.

14         THE COURT:  The objection is overruled.  The
           ladies and gentlemen of the jury will
15         remember that the attorneys are not witnesses
           and that you are the triers of the fact and
16         will determine the facts from the evidence
           that has been presented.  You may proceed.
17
Reporter's Transcript of Proceedings ("RTP"), May 5, 2005,
18
1456:25 - 1457:25.
19

20      The Government argues that the Prosecutor's comment was

21 invited by the following comment from the Defense Attorney Reyes:

22         Now, there's something else that bothered me
           in this case, too, and that's the use of
23         Zayed.  Call him Sam.  Call him Zayed.  Mr.
           Othman. Mr. Kisswani.  He had several other
24         names, but when asked he acknowledged that he
           was that person.  It bothers me when our
25         government creates a relationship -- and I
           say kind of strange bed fellows, a
26         relationship with someone who come forward
           here and testify who is quite a character.
27         An individual who is a known established
           admitted criminal. And here, because he said
28         I was promised nothing, so he said.  The
           truth of the matter is although not directly

**14**

1
2
3
4
5
6
7
8
9
10
11
12

          promised, he obtained his liberty and his
freedom based on what we know is his
involvement with the government.  It's like
bringing in a big shark to deal with these
little goldfish.  It's like having the
government bring in the greatest sinner to
have a potential menial sin.  This is the
case, ladies and gentlemen, I say which
bothers me.  Because it's the lack of
evidence, it is that quantum leap, it is that
push the government would like you to take
that added step to fill in the blanks.  Now,
Chief Justice Earl Warren, in his memoirs,
wrote about his days when he was a young
prosecutor.  And he writes about his
experiences with rats, informants, people who
have dealt with the scum of the world and
basically become professional witnesses.  And
he talks about the injustices that he
observed firsthand.  And why he, as a
prosecutor, never again chose to prosecute a
case with an informant.

RTP,  May 5, 2005, 1432:14 - 1433:14.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      In support of their contention, Defendants cite *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983), where the Ninth Circuit found the Prosecutor's comments about Defense counsel during a criminal trial to be prejudicial to Defendant.  The Prosecutor in *Bruno* inferred that a reversal in the testimony of a pro prosecution witness was the result of her consultation with the accused's attorney.  *Bruno*, 721 F.2d at 1194.  In *Bruno*, the Prosecutor repeated this theme in his closing argument by labeling Defense counsel's actions unethical and illegal, without producing a shred of evidence to support these accusations.  *Id.* He also hinted to the jury that the accused's hiring of Defense counsel was probative of his guilt.  *Id.*  This argument suggested that all Defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth in an attempt to confuse the jury as to the accused's involvement with alleged

1    crimes.  *Id.*  Again the Prosecutor offered no evidence to support

2    these suspicions.  *Id.*

3        The Prosecutor's closing arguments in *Bruno* are

4    distinguishable from the Prosecutor's closing arguments in this

5    case.  Here, Ms. Escobar directly responded to arguments by the

6    Defendants, which invited comment on subjects Defendants raised

7    based on evidence in the record.  For example, Ms. Escobar argued

8    that Defendants' joint presence at the McDonald's on November 20,

9    2003 was not a mere coincidence and that Defendants were present

10   with money ($20,000), firearms (Zazueta and Nobari), and George

11   and Nobari participated in negotiations with Agent Galvan on that

12   date.  RTP, May 3, 2005, 1458:5-15.  This evidence is consistent

13   with the theme of the Government's case.

14       The term "red herring" is a recognized rhetorical analogy by

15   the Ninth Circuit.  *See Ishikawa v. Delta Airlines, Inc.*, 343

16   F.3d 1129, 1132 (9th Cir. 2003) ("The argument that the federal

17   scheme does not create a private right of action is a red

18   herring."); *see also United States v. Skurdal*, 341 F.3d 921, 926

19   (9th Cir. 2003) (the Government's argument that trial counsel did

20   not improperly withdraw as Defendant's counsel is a red herring).

21   The analogy refers to an attempt to divert attention from issues

22   on which the Prosecutor seeks to focus.  The Prosecutor's

23   arguments constituted an attack on the strength of the merits of

24   the defense, not on the integrity or personalities of Defense

25   counsel.  The Prosecutor was entitled to some latitude based on

26   Defense counsels' comments describing the Government's informant

27   as a "rat" and "a big shark gulping up gold fish for breakfast."

28   In the entire context of the trial, the Prosecutor's red herring

**16**

1   comment did not materially prejudice the Defendants.

2   **d.   Inflaming the Passions of the Jury**

3   Defendants argue that the Prosecutor attempted to inflame

4   the passions of the jury with the following comment:

5       MS. ESCOBAR: Ladies and gentlemen, Zazueta
        came prepared for this deal. Guns and drugs
6       go hand in hand. Had these agents not been
        out there, this would have been another drug
7       rip and who knows what would have happened to
        the little boy that was coming out of that
8       McDonald's.

9       MR. NUTTALL: Objection, Your Honor, that's
        not proper.
10
        MR. REYES: Join
11
        THE COURT: The objection is sustained. The
12      jury will determine what bearing any
        testimony or evidence has on the issues to be
13      decided. You may continue.

14   RTP, April 29, 2005, 1347:2-12.

15   The Defense cites *United States v. Weatherspoon*, 410 F.3d

16   1142 (9th Cir. 2005), and states that the Prosecutor's comment

17   was "clearly designed to encourage the jury to enter a verdict on

18   the basis of emotion rather than fact."  In *Weatherspoon*, the

19   prosecutorial statement at issue pertained to the Prosecutor's

20   repetitive statements that in convicting the defendant the jury

21   would be "protecting other individuals in the community" and

22   somehow helping to ameliorate society's woes.  *Weatherspoon*, 410

23   F.3d at 1149.  The court reasoned that the prosecutorial

24   statements were improper because they spoke not to the proof

25   presented at trial but rather to the potential social

26   ramifications of the jury's reaching a guilty verdict.  *Id.*

27   The Prosecution's isolated statements did not allude to a

28   potential for harm not presented by any evidence during trial.

**17**

The four Defendants were at the Turlock McDonald's, two in two cars.  A firearm was in each of the cars Defendants occupied at the transaction site.  Although calling for speculation, Circuit law recognizes the relationship between guns and drugs.  *See, e.g.*, *United States v. Pitts*, 6 F.3d 1366, 1371 (9th Cir. 1993). Defendants had only $20,000, not the $400,000 cash that had been discussed as the purchase price for 20 cases of pseudoephedrine. There is no dispute the pseudoephedrine was being purchased to manufacture illegal drugs: methamphetamine.  The evidence supports the inference the Prosecutor argued that Defendants intended to "rip off" the sellers for 18 cases.  The Prosecution's statement does not unwarrantedly ask jurors to be the conscience of the community.  Unlike *Weatherspoon,* this simple statement was not repeated.  The Defense objected to the argument and the objection was sustained.  The jury was given a curative instruction.  Any potentially harmful effect against Defendants was ameliorated during closing arguments.

### e.   Misstating the Evidence

Defendants argue that Prosecutor misstated evidence when she made the following comment:

> MS. ESCOBAR: As for the firearm charge contained in Count Three, the 924(c) charge as we call it, the use of the firearm in connection with drug trafficking crimes. Well, you've heard throughout this trial guns are common tools of the drug trade.  Guns are used by drug dealers to protect themselves and to protect their contraband.  Sometimes they're used as a means of intimidation to obtain contraband.  The fact that Nobari and Shino possessed fully loaded firearms during this drug deal not only supports their involvement in the narcotics conspiracy but indicates too that they possessed the firearms in furtherance of the drug

**18**

1          trafficking conspiracy.

2          MR. HUNT: Well, Your Honor, I'll object
           again.  That's a misstatement of the
3          evidence, that Shino possessed a firearm.

4          THE COURT: Objection is sustained. The jury
           will determine from the evidence and the law
5          what the ultimate facts are.

6          MS. ESCOBAR: That's right. I misspoke. Nobari
           and Zazueta actually possessed firearms. So
7          there's no question with respect to their
           possession, to their use of a firearm in
8          connection with a drug trafficking offense.
           However, even though both Nobari and Zazueta
9          actually possessed the weapons, George --
           Defendants George and Shino are equally
10         culpable. Because under the law, as the judge
           is instructed, a person has possession of
11         something if they either actually possess it
           or constructively possess it.  Constructive
12         possession is having the ability to exercise
           dominion or control over a weapon. And we
13         know that George had access to a firearm when
           he was handing the money over to Galvan.
14         George constructively possessed Nobari's
           firearm, even though he did not actually have
15         it on his person.

16    RTP, April 29, 2005, 1352:24 - 1354:4.

17         Defendants argue that the Prosecution's statement regarding

18    Shino actually possessing a gun was misleading to the jury.

19    However, immediately after the statement was made, an objection

20    was sustained, a curative instruction was given and the

21    Prosecutor admitted to the jury that she had misspoken.  She was

22    entitled to argue joint and constructive possession under the

23    conspiracy and aiding and abetting theories.  Any potential for

24    prejudice against Shino was cured during trial.  Further, the

25    statement that Nobari and Zazueta actually possessed a firearm

26    was a legal argument properly made by the Prosecution and

27    supported by the evidence.  The evidence showed Zazueta's actual

28    possession of a firearm, as well as a firearm present at the deal

**19**

1   site which was registered to Nobari, found in a car Nobari and

2   George were to travel to the meet, and located in the passenger

3   side of the vehicle where Nobari was sitting.   This firearm

4   evidence was consistent with the Prosecution's theme of her case.

5   Some examples include:

6   1.   Agent Galvan testified that Zazueta was present and armed
         during the transaction. RTP, April 21, 2005, 471:19-23.

7

8   2.   Agent Galvan gave expert testimony that narcotic traffickers
         commonly use firearms.  RTP, April 21, 2005, 473:13-14.

9   3.   The jury was shown photos of a Baretta firearm found in the
         rear pocket of Zazueta, which fell to the ground at the time

10       of his arrest.  RTP, April 21, 2005, 415:12-17.]

11              **f.   Continued Reference To Past Objectionable and
                      Previously Inadmissible Evidence**

12

13  Defendants argue that the Prosecution continued to refer to the

    following evidence ruled inadmissible:

14

15              i.   MS. ESCOBAR: The toll records show, and
                     you'll review those records, you'll

16                   review all the evidence that's been in
                     our carts the last two weeks.  The toll

17                   records show that after George
                     negotiated with Agent Galvan, on

18                   November 20th, George called Defendant
                     Shino. Shino then called George more

19                   than once.  Shino then called Nobari
                     more than once and Nobari called Shino.

20                   Then -- that was on the 19th. That was
                     on the 19th.  The next day, the 20th,

21                   which was a work day and a school day we
                     saw from the videotape. We saw the kids

22                   with their backpacks.  None of these men
                     were working.  They had a huge chunk of

23                   time in the afternoon of the 20th to
                     confer about prices and get the money

24                   together for the 200 cases of
                     pseudoephedrine.  At any rate, Agent

25                   Galvan contacted George by phone around
                     noon. This was the testimony. George

26                   tried to contact Shino then ten times,
                     you'll see from the records, the toll

27                   records, between 12:30 and one o'clock.
                     And after Galvan contacted George,

28                   Zazueta contacted Daniel Jiminez.

**20**

1

2      MR. REYES: Objection. There's no
       evidence of that, Your Honor.

3      THE COURT: All right. The objection is
       sustained.

4      You may refer to the phone numbers.

5      MS. ESCOBAR: Zazueta contacted the
       tolls, the number associated with Danny

6      Jiminez and, as the judge has
       instructed, you may consider

7      circumstantial evidence. And you may
       consider -- the judge has told you,

8      circumstantial evidence and direct
       evidence are the same, carry equal

9      weight.

10     RTP, April 29, 2005, 1337:23 - 1338: 25.

11     ii.  MS. ESCOBAR: Agent Galvan not only
            showed them the truck, but you saw on

12          the videotape. Defendant George walked
            into the truck, he inspected the pills.

13          Defendant Nobari stood outside the back
            of the truck and looked in while

14          Defendant George was inspecting the
            buckets of pills. While Defendant George

15          was negotiating with Agent Galvan.
            During this time of the negotiation, the

16          first time they were negotiating at the
            McDonald's for the truck load full of

17          pills, George was seen on the videotape
            contacting who he called an individual

18          called "Sheen." And you know, ladies and
            gentlemen, the toll records will bear

19          out that the person he contacted on the
            20th was Shino.

20

21          MR. HUNT: Your Honor, objection. It's
            misstating

22          the evidence. The toll records show
            there was a call, but

            not --

23

24          THE COURT: The objection is sustained.

25          MS. ESCOBAR: Again, you may rely on
            circumstantial evidence. That is

26          evidence that, through a chain or series
            of events that establishes the fact that

27          this person had a phone, showed up at a
            meet, used that phone. Toll records show
            calls by George to him calling him

28          "Sheen." You may have heard that is

**21**

1
2
circumstantial evidence, ladies and
gentlemen. That is the leaking hose on
the wet sidewalk.

3   RTP, April 29, 2005, 1339:20 - 1340:10.

4
5
6
7
8
9
10
11
            iii.  MS. ESCOBAR: The toll evidence also
                  graphically illustrates the association
                  of the defendants in the conspiracy. And
                  as I said, you may use the
                  circumstantial evidence in this case to
                  deduce that it was, in fact, George and
                  it was, in fact, Zazueta. It was, in
                  fact, Shino and it was, in fact, Nobari
                  that made those calls. And that chart
                  shows the relationship amongst the co-
                  conspirators during the time frame of
                  the conspiracy based on the toll record
                  evidence that we have. And during the
                  negotiations, in fact, the agents saw
                  all the defendants talk on cell phones.

12
13
                  MR. REYES: Objection. Misstates the
                  evidence.

14
15
                  THE COURT: The jury will make their own
                  determination as to what the evidence
                  shows regarding who was using cell
                  phones.

16   RTP, April 29, 2005, 1351:12-21.

17
18
19
20
21
22
23
24
            iv.   MS. ESCOBAR: Well, you've heard
                  throughout this trial guns are common
                  tools of the drug trade. Guns are used
                  by drug dealers to protect themselves
                  and to protect their contraband.
                  Sometimes they're used as a means of
                  intimidation to obtain contraband. The
                  fact that Nobari and Shino possessed
                  fully loaded firearms during this drug
                  deal not only supports their involvement
                  in the narcotics conspiracy but
                  indicates too that they possessed the
                  firearms in furtherance of the drug
                  trafficking conspiracy.

25
26
27
                  MR. HUNT: Well, Your Honor, I'll object
                  again. That's a misstatement of the
                  evidence, that Shino possessed a
                  firearm.

28
                  THE COURT: Objection is sustained. The
                  jury will determine from the evidence

22

1  and the law what the ultimate facts are.

2  MS. ESCOBAR: That's right. I misspoke.
   Nobari and Zazueta actually possessed
3  firearms. So there's no question with
   respect to their possession, to their
4  use of a firearm in connection with a
   drug trafficking offense.

5  RTP, April 29, 2005, 1353: 10-19.

6

7  v.  MS. ESCOBAR: When I asked George about -
    - Defendant George, when he was
    testifying, during cross-examination,
8   about Jorge Padilla, whose number
    appeared in George's cell phone, George
9   claims to have met him at the gym and
    did not know he was wanted for
10  methamphetamine trafficking.

11  MR. NUTTALL: I'm going to object, Your
    Honor, we made a motion to strike that
12  evidence and the motion to strike was
    granted and our objection was sustained.

13
    MR. REYES: Join.
14
    MR. HUNT: Join.
15
    THE COURT: All right. The objection is
16  sustained.  The jury will follow the
    instruction the Court gave.

17
    MS. ESCOBAR: If you look at Jiminez' Day
18  planner, which was marked 7-B,
    Government Exhibit 7-B, there is a
19  purple business organizer contained in
    that Day planner marked 7-E. You will
20  see the name Jorge Padilla. The same
    name and number that --
21
    MR. NUTTALL: I'm going to object, Your
22  Honor, thesame objection.

23  THE COURT: That objection is overruled.

24  RTP, May, 3, 2005, 1454:18 - 1455:12.  The Defendants have not

25  identified other instances in the record where the Prosecution

26  continued to refer to these planner references after they were

27  objected to. The Defense also fails to show how these comments

28  make it more probable than not that the verdict was affected.

23

**ii.   Prosecutor's Direct Examination**

    **a.   Inflamed the Passions of the Jury By Questioning About Operation Mountain Express**

Defendants also argue that including testimony about Operation Mountain Express was done to inflame the passions of the jury:

> BY MS. ESCOBAR:
> Q. And what was Mountain -- there were actually two phases of Operation Mountain Express; is that -- is that correct?
> A. At least two, maybe even three, I'm not positive on that.
> But yes.
>
> Q. And would you explain to the ladies and gentlemen of the
> jury what was Mountain -- Operation Mountain Express?
>
> A. Operation Mountain Express, what we do when --
>
> MR. NUTTALL: Objection, Your Honor, this is outside the scope of this phase of --
>
> THE COURT: To the extent that there was an explanation offered, I'm not going to state what it was, but there was a direct suggestion of what the prior case number was and what it related to, that's what this pertains to.
>
> MR. NUTTALL: It related to the --
>
> THE COURT: The same subject.
>
> MR. NUTTALL: -- the participation of this informant.
>
> THE COURT: It related to him, but the government, since that door was opened, and she didn't open it, is entitled to explain the whole picture. Overruled. You may answer.

RTP, April 26, 2005, 863:20-864:10.

Taking the context as a whole, this line of questioning is not improper or so gross as to prejudice Defendants.  It was not

**24**

improper for the Government to question its witness on Operation
Mountain Express, a matter that was previously inquired into by
the Defense who opened the door and relevant to the
organizational scheme of pseudoephedrine and methamphetamine
trafficking.  After the court granted Defendants' motion in
limine about additional methamphetamine trafficking and
manufacture that was under investigation, Defendants chose to
cross-examine the agent on his notes that referred to the
Mountain Express investigations and thereby opened the door to
this reference, which was not repeated.

> **b.   Eliciting Testimony From Government Witness
> Regarding The Informant's Veracity**

Defendants argue that the Prosecution improperly engaged in the
following line of questioning:

> MS. ESCOBAR: And so from that time, August
> 2002 to the present, has your experience --
> have you -- has the defendant -- has the
> informant been reliable?
>
> A. Yes.
>
> Q. Has the informant been truthful?
>
> A. Yes.
>
> MR. NUTTALL: Objection. Lack of foundation.
>
> THE COURT: Well, lay the foundation.
>
> MR. NUTTALL: That calls for speculation.
>
> THE COURT: Let's see if there's a foundation.
> That objection is overruled. There's no basis
> for me to rule on it.
>
> BY MS. ESCOBAR:
> Q. In your dealings with the informant, has
> he been where
> he -- has he followed your instructions?
>
> A. Yes.

1

2

Q. Has he complied with the DEA conditions of
being an informant?

MR. NUTTALL: Objection. Lack of foundation.

3

4

5

THE COURT: Let's find out how many instances
in which there's been interaction between
this witness and the informant.

6

7

BY MS. ESCOBAR:
Q. Would you describe your -- the number of
interactions that
you've had with him.

8

9

A. I've probably spoken to him daily since
August 2002.

10

Q. Has he always been available to you?

11

A. Yes.

12

13

Q. Has his information that he's provided to
you been, based on your experience with him,
reliable?

14

A. Yes.

15

16

MR. NUTTALL: Again, objection, Your Honor.

THE COURT: That objection is overruled.

17

BY MS. ESCOBAR:

18

Q. Has your -- in daily contacts with him,
has he always been truthful? Based on your --

19

20

MR. NUTTALL: Same objection. Lack of
foundation.  No way that this witness can
know.

21

THE COURT: Let me have counsel approach.

22

23

RTP, April 28, 2005, 1199:3 - 1200:16.

24

25

During sidebar the judge explained to the attorneys that the

line of questioning would be kept "within careful confines."

26

27

RTP, April 28, 2005, 1201:15.  The witness could only describe

his personal knowledge of the informant's past performance, as

28

Defendants sought to impeach the informant's credibility, called

**26**

him a liar and suggested the informant was unreliable.

Consequently the objection was overruled.  The Prosecutor's line

of questioning was narrowly tailored to prevent any undue

prejudice to Defendants.  The Defense concedes that Defense

counsel also raised the issue of plea agreements, other benefits,

and the informant's background and criminal history, which they

explored on cross for the better part of a day, thus opening the

door for questioning about such plea agreements.  (Doc. 295,

SEALED Defendant Rito S. Zazueta's Motion for New Trial, File

February 1, 2006.)

## C.    Plain Error

     If trial counsel does not object, claims that a prosecutor

committed misconduct are reviewed for plain error.  *United States*

*v. Rodriguez-Preciado*, 399 F.3d 1118, 1132 (2005); *Cabrera*, 201

F.3d at 1246;  *see also United States v. Tam*, 240 F.3d 797, 804

(9th Cir. 2001).  Federal Rule of Criminal Procedure 52(b)

provides that "plain errors that affect substantial rights may be

considered even though [they were] not brought to the court's

attention."  The authority Rule 52(b) provides is circumscribed.

*Olano v. United States,* 507 U.S. 725, 732 (1993).  First, a

defendant has the burden of showing there is an actual error.

*Id.* at 734.  Deviation from a legal rule is "error" unless the

rule has been waived.  *Id.* at 732.  A defendant must also show

that the error is plain, clear, or obvious.  *Id.* at 734;

*Anderson,* 201 F.3d at 1149-50.  Lastly, the plain error must have

been prejudicial.  *Anderson,* 201 F.3d at 1150.  If these

conditions are met the error is reversible only if it seriously

affects the fairness, integrity, or public reputation of judicial

**27**

1  proceedings.  *Id.*

2      **i.  Prosecutor's Closing Arguments**

3          **a.  Impermissible Vouching During Closing Argument**

4      The Government is prohibited from vouching for the

5  credibility of its witnesses, its case, or the Prosecutor

6  herself: (1) by "placing the prestige of the government behind

7  the witness" through personal assurances; or (2)suggesting that

8  information not presented to the jury supports the witness'

9  testimony.  *United States v. Weatherspoon*, 410 F.3d 1142, 1146

10 (9th Cir. 2005).  Defendants argue that the Prosecutor placed the

11 prestige of the government in her case when stating:

12         MS. ESCOBAR: Thank you, Your Honor.  Ladies
           and gentlemen, 19 years ago when I became a
13         federal prosecutor, I did take an oath to
           uphold and defend the constitution and the
14         laws of the United States, to protect the
           constitution from all enemies, both foreign
15         and domestic.  That is what I have done in
           this case. That is what the law enforcement
16         agents have done.  We have done our job,
           ladies and gentlemen. We have gone from here
17         to here. We went from here to here in two
           days, ladies and gentlemen.  The defendants
18         are no longer presumed innocent.  We have
           proven the defendants guilty beyond a
19         reasonable doubt.  The defense attorneys have
           also done their job to the extent that they
20         have insured that their clients receive a
           fair trial. But it is not their job to
21         redefine the law.  The law which you must
           follow is the law that has been defined to
22         you by the Court.

23 RTP, May 3, 2005, 1452:7-1452:24.

24     The Prosecution rejoins that her comment was invited and was

25 necessary to "right the scales" after Attorney Reyes made the

26 following argument:

27         Usually before I close in a closing argument,
           I try to think of how I could best put this
28         case with one central theme before you. I

1
2
3
4
5
6
7

> like the temple of justice. And I like the
> thought of the part that I said in the
> beginning about let's get real. And I said
> let's get real because a lot of the evidence
> in this case, ladies and gentlemen, involves
> the government's ability to utilize what I
> referred to as the power of the oath to be
> able to stretch, to expand, to infer, to take
> that quantum leap that they want you to take.
> And ladies and gentlemen, I'm going to ask
> you not to take it. And I'll give you several
> reasons why.

RTP, May, 3, 2005, 1425:22-1426:7.

8
9
10
11
12
13
14
15
16
17
18
19

The Prosecution's comments in this instance do no more than respond to the inference Mr. Reyes raised about the prosecution taking "leaps of faith" and using the power of the oath to "expand" the evidence.  The Prosecutor's remarks about her personal history were not based on the record, but only suggested inartfully that the substantial evidenced adduced by the government has rebutted the presumption of innocence to prove their guilt beyond a reasonable doubt.  No deviation from the rule against improper vouching was so "plain, clear, or obvious," as to be prejudicial and seriously affect the fairness, integrity, or reputations of the proceedings.

20

### b.   Improper Disparaging of Defense Counsel

21
22

Defendants also argue against the following comment by the Prosecutor in her closing:

23
24
25
26
27
28

> MS. ESCOBAR:  As for Shino, his lawyer talked
> about puffing like some used car salesman
> would.  Well, maybe Mr. Hunt did a lot of
> puffing when he was running for elected
> office, but the drug deal in this case was
> not about puffing, ladies and gentlemen.
> Shino is not a follower.  George Nobari and
> Zazueta all conferred with Shino.  They went
> to Shino's house to confer with each other
> during the process of getting the money for
> the pseudoephedrine pills.  George constantly
> touched base with Sheen throughout the

> transaction.  It was Shino who came with
> Zazueta to the McDonald's in Jiminez' truck
> with cash, deadly weapon and extra
> ammunition.

RTP, May 3, 2005, 1459:6-16.

The Prosecution argues that their argument was invited by the following comment during Attorney Hunt's[2] closing:

> Now, when others were talking about the
> discussions between different defendants and
> Mr. Zayed, they were talking about $400,000
> worth of pills. $200,000. Things of that
> nature. And it reminded me of a concept that
> we studied in law school. And that is if you
> go on a car lot and you say to the car
> salesman, "How many miles to the gallon does
> this car get?" And he says, "Oh, it will get
> about 75 miles to the gallon." And you rely
> on that and you buy the car. And then
> you try to sue him for misrepresentation
> because there's no way it's going to get 75
> miles to the gallon. In the law, that is
> called puffing. It is so ridiculous that
> nobody would believe it. And that's why it's
> called puffing.

RTP, April 29, 2005, 1414:6-17.

During voir dire Mr. Hunt made reference to his role as a former prosecutor for Fresno County.  The Prosecution's comment was an attempt to use an analogy about "puffing" that responded to Mr. Hunt's puffing argument and his allusion to his status as a former prosecutor in an awkward attempt to "right the scale." Given the strength of the evidence presented against Defendants during trial, it cannot be said that this argument was so prejudicial that it seriously affected the fairness, integrity, or public reputation of the proceedings.  Any error was harmless. //

---

[2] Mr. Hunt is Defendant Eddy George's attorney.

**c.    Inflaming the Passions of the Jury**

The Defense argues that the Prosecution impermissibly inflamed the passions of the Jury by making the following statement:

> MS. ESCOBAR:
> In the end, ladies and gentlemen, it all comes down to this. Common sense tells you the defendants are drug dealers who came to McDonald's in Turlock not to buy a Big Mac, they came with guns and cash to buy them pseudoephedrine to cook 183 pounds of pure methamphetamine. That's it. One more thing.
>
> (A tape was played.)
>
> Ladies and gentlemen, that is not the product of government entrapment.  You heard the concern in the voice of Agent Galvan. A 23-year Fresno Police Department veteran, concern for another human being as Mr. Nuttall would say, genuine concern. Because he knew this was a volatile situation. This was the real deal. These drug traffickers pose a real and viable threat. Had it not been for the intervention of these law enforcement officers, it was a volatile situation. There was a real danger. The City of Turlock should be thankful to law enforcement for their efforts in diffusing a volatile situation, for finding these drug traffickers and you, ladies and gentlemen, should not let the City of Turlock down. We've proven they are drug traffickers. It is your duty now to find them guilty. Thank you.

RTP, May 3, 2005, 1471:9-1472:5.

The Defense again cites *United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005), and states that Prosecutor's comment was "clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact."  In *Weatherspoon*, the improper prosecutorial statement was the Prosecutor's repetitive statements that in convicting defendant the jury would be "protecting other individuals in the community" and somehow

helping to ameliorate society's woes.  *Weatherspoon*, 410 F.3d at
1149.  The court reasoned that the prosecutorial statements were
improper because they spoke not to the proof presented at trial
but rather to the potential social ramifications of the jury's
reaching a guilty verdict.  *Id.*

Because no objection was made during trial, the statement is
reviewed under plain error analysis.  Whether the prosecution's
statement urged the jury to render their decision based on
emotion is a close call.  The statement describes Defendants as
drug dealers and a threat to the City of Turlock and its
citizens.  She goes on to argue the evidence has proven beyond a
reasonable doubt that Defendants were acting as drug dealers and
should be convicted.  Balanced against the overwhelming evidence
at trial, the Defense fails to show how such statements were so
grossly prejudicial that it affected the integrity of Defendants'
trial or resulted in such prejudice that but for the argument the
outcome would have been different.  Defendants have not met their
burden under the plain error standard.

### d.  Misstating The Evidence

The Defense argues that the Prosecutor misstated the
evidence against Defendant Nobari when making the following
argument:

> MS. ESCOBAR:
> As George admitted to you, he's known Shino
> and Nobari for a long time. They were trusted
> associates. As the video and the audio
> recordings show, those two trusted
> associates, Shino and Nobari, who showed up
> at the deal with them, they showed up with
> money and firearms.  Although you don't hear
> Shino's words on any of the recordings, you
> do hear George talking to "Sheen" on the
> phone during his meetings with Galvan and

1
2

> attempting to gather up the money for the
> buckets of pills. And George also told Galvan
> that Shino wanted the seven buckets of pills.

3   RTP, April 29, 2005, 1350:19-1351:3

4      The Defense argues that the Prosecutor misled the jury by

5   arguing that Nobari "actually possessed" the gun.  The Defense,

6   however, ignores that the firearm was registered to Nobari, and

7   was in the car at the drug deal, on the passenger side near where

8   Nobari was sitting.  The argument was not "error," so plain,

9   clear or obvious, and prejudicial that it affected the integrity

10   of the trial.  Specifically, the evidence was that, during the

11   drug transaction, a loaded Glock firearm registered to Nobari was

12   found on the passenger side of George's Honda Civic where Nobari

13   was seated at the time the drug deal was to be executed.  The

14   jury was also presented with a videotape that showed Nobari

15   appearing to place a firearm in his waistband when meeting with

16   co-Defendant Shino at his residence.  Given this substantial

17   evidence, the Prosecutor's comment about Defendants (Nobari

18   included) showing up with firearms was a reasonable inference

19   drawn from the actual evidence that was presented to the jury.

20   **e.   Continued to Refer to Past Objections and Facts**
     **Not In Evidence Which Were Sustained.**

21

22      The Defense also argues that the Prosecution engaged in

23   improper conduct by referring to previous objections and

24   inadmissible evidence when she stated:

25

> MS. ESCOBAR: This is the government's theory
> and it's a theory that the circumstantial
> evidence supports.  The phone that Shino had
> in his possession contacted George several
> times then.  The phone that Shino possessed
> then contacted the phone associated with
> Daniel Jiminez several times.  Zazueta also
> then contacted Jiminez. Around 2:30, then --

26
27
28

those calls were all made before 2:30. Around
2:30, George and Nobari then left to go get
what would have been $220,000 for the 22
buckets of pseudoephedrine that was in the
truck.  First they went to Shino's residence
on Fosberg, which we've seen before. Also in
Turlock. Right about here.  And we saw a
videotape that was taken by Agent Bret
Campbell at the Fosberg residence.  And we
see, during that time, that George Nobari and
Shino met.  That was on the videotape. But
the toll records, when reviewed in
conjunction with the videotape, are also
instructive. When they went to Shino's
residence, around the time they arrived
there, the toll records for Shino's phone
show that he called Jiminez, the phone
associated with Jiminez, two times.  While
Shino, George and Nobari were meeting,
George, the phone that he had, called Agent
Galvan and at that time said his people --
and this was recorded -- were used to dealing
in bottles. You've heard the testimony of
Agent Galvan. It's at that time when they're
at Fosberg meeting together, Shino, George
and Nobari, that George said his people were
leery of the buckets because they were used
to dealing in bottles.

RTP, April 29, 2005, 1341:14-1342:16.

Defendants do not specifically demonstrate how this
statement is a deviation from the evidence that constitutes
"error" which is plain or obvious, and so prejudicial that it
seriously affects the integrity of the proceedings.  Defendants
have not met their burden under the plain error standard.

**ii.  Trial Testimony**

**a.   Racial Testimony by Informant Zayed and Agent
Jones During Trial**

Defendants also argue that the Prosecution engaged in racial
and ethnic stereotyping by undertaking the following line of
questioning of Informant Zayed:

BY MS. ESCOBAR:
Q. Were you given special permission to

**34**

1

travel outside the Northern District of
Illinois, the Chicago area, to testify here?

2

A. It took a while, but the subpoena -- we
had -- she had to see the subpoena that the
defense subpoenaed me for me to come up here.

3

4

Q. So you had to receive -- you had to get
their blessing in order for you to leave the
district?

5

6

A. Yes.

7

Q. Otherwise you would have not been in
compliance with your conditions of probation?

8

9

A. Yes

10

Q. Or supervised release, I guess. And it was
your testimony, I believe, that the co-
defendants in the Arizona case, the co-
defendants that you are aware of did not
receive a sentence in excess of five years?

11

12

13

A. Yes.

14

Q. That there were different sentences up to
five years --
A. Yeah.

15

16

Q. Or not more than five years.

17

A. Not more -- I know who got like -- most of
the Middle Easterns, I know what they got.

18

19

Q. And speaking of Middle Easterns, based on
your experience in the pill business, what --
are there Middle -- I mean, do you -- did you
conduct business with Middle Easterns?

20

21

A. Mexicans.

22

Q. In what capacity did you know Mexicans?

23

A. Cooks.

24

Q. Have you ever known, in the -- your pill
trafficking, Middle Easterners to actually
cook?

25

26

A. There isn't a Middle Eastern that cooks,
no.

27

Q. What primarily do the Middle Easterns --

28

**35**

1        A. We bring it from Canada to Chicago to
         California.

2

3        Q. Do the Middle Easterners serve primarily
         as pill brokers?

4        A. Brokers, yes.

5        Q. And in your experience, the Mexicans, as
         they were referred to even in these

6        conversations with Eddy George, based on your
         experience, they would be the people involved

7        in
         actually extracting the ephedrine from the

8        pills to make the
         methamphetamine?

9        A. They're the cookers, that's their secret.

10       You know, they never let us know their secret
         of cooking. That's who cooks the pseudo and

11       did all the pseudo. They called it cooking.

12   RTP, April 28, 2005, 1109:1-1110:18.

13       Another instance to which Defendants object as racial and

14   ethnic stereotyping was during Agent Galvan's testimony:

15

16       BY MS. ESCOBAR:
         Q. Is there a hierarchy within a drug
         trafficking organization?

17

18       A. Yes.

         Q. Would you explain that.

19

20       A. You have couriers, you have transporters,
         you have your money guy, particularly in

21       methamphetamine drug dealing, you have cooks,
         you have people that go around and buy

22       precursors.

23       Q. And in terms of cooks, based on your
         experience in Chicago and investigating

24       pseudoephedrine pill cases --

25       MR. REYES: This is improper rebuttal.

26       THE COURT: Overruled. You can answer.

27       BY MS. ESCOBAR:
         Q. Do certain ethnic groups, Mexicans,
         perform certain roles within the

28       methamphetamine, methamphetamine

**36**

1          organization?

2          A. Based on -- based on my experience with
           the wiretaps and other investigations, the
3          individuals handling the pseudoephedrine are
           of Middle Eastern descent and they talk about
4          trying to get the pseudoephedrine to
           California --
5
           MR. NUTTALL: Objection, nonresponsive, Your
6          Honor.

7          THE COURT: Sustained.

8          BY MS. ESCOBAR:
           Q. The Mexican -- the role of Mexicans and
9          the reference to "Mexicans" by Eddy George in
           the transcript, what did that signify to you?
10
           A. That the final destination of the
11         pseudoephedrine was going to be a Mexican.

12         Q. And what, based on your training and
           experience in the investigation of
13         methamphetamine labs, is there -- what was
           the role of the Mexicans?
14
           A. The pseudoephedrine would be given to a
15         Mexican cook and it would be converted with
           other chemicals into methamphetamine.
16
           Q. Based on your training and experience in
17         investigating pseudoephedrine pill cases,
           having seen Middle Easterners participate in
18         pseudoephedrine pill trafficking?

19         A. Yes.

20         Q. A large number?

21         A. Yes.

22         Q. And based on your training and experience,
           what is the role that Middle Easterners play?
23
24         A. The cases that I have been involved in,
           the Middle Easterns were secreting the
25         pseudoephedrine from Canada into the United
           States with the final destination being
26         California.

27         Q. And typically, what is the role that they
           -- are they involved directly in the
28         manufacturing process, the Middle Easterners?

                              **37**

A. Based on my experience, the Middle
Easterners are simply controlling the
pseudoephedrine trade and, as a middle man,
and getting the pills to a cook.

Q. Who you have seen based on your training
and experience to be what ethnic background?

A. For which?

Q. The cooks.

A. Of Mexican descent.

RTP, April 28, 2005, 1240:4-1242:8.

The following day Mr. Hunt requested that the testimony be
stricken.  In response to this request the court gave the
following limiting instruction about racial and ethnic
references:

THE COURT:
Yesterday there was some testimony by Agent
Jones and I wanted to give you a limiting
instruction on this testimony.  The agent
testified that in the context of this
particular case, that the evidence and his
observations caused him to associate, as he
used the words, Middle Easterners and then as
he used the word "Mexicans" with either pill
brokering or cooking. Now, I want you to
understand that his testimony is to be
considered by you only in the context of this
case and the evidence that is in this case
and his particular perspective in the Chicago
area.
    You are not to consider that to suggest
that any particular ethnic group or persons
of a particular racial origin have these
characteristics or tendencies or that where a
person is born or what a person's ethnicity
is has anything to do with whether he or she
is likely or not likely to engage in criminal
activity.

RTP, April 29, 2005, 1263:24-1264:14.

In support of their argument, the Defense cites to *United
States v. Cabrera*, 222 F.3d 590 (9th Cir. 2000).  Defendants in

1  *Cabrera* appealed their conviction for conspiracy to distribute,
2  possession with intent to distribute, and distribution of crack
3  cocaine. *Cabrera*, 222 F.3d at 591. Defendants argued that the
4  government's lead witness was improperly questioned and testified
5  to stereotypes about Defendant's Cuban origin. *Id.* On direct
6  examination the witness provided testimony that round, flat,
7  wafers of cocaine were typical of members of the Cuban community.
8  *Id.* at 592. He also testified that Cubans had a tendency to be
9  flight risks given their history of migrating to America. *Id.* at
10 593. The court reasoned that appeals to racial, ethnic, or
11 religious prejudice during the course of a trial violate a
12 defendant's Fifth Amendment right to a fair trial, due process
13 rights, and equal protection rights. *Id.* at 594. It further
14 held that most of the witness' references to Cubans did not
15 qualify as relevant evidence in the trial. *Id.* at 596. The
16 witness' testimony only made it seem like the Las Vegas drug
17 market was falling under the control of Cuban drug dealers. *Id.*
18 While the testimony about how Cubans package their drugs may have
19 been relevant to other aspects of the case, it was prejudicial
20 because it added to the perception that Cuban drug dealing was a
21 city wide problem in Las Vegas. *Id.*

22     Evidence is relevant if it has "the tendency to make the
23 existence of any fact that is of consequence to the determination
24 of the action more or less probable than it would be without the
25 evidence." Fed. R. Evid. 401. Evidence that is not relevant is
26 not admissible. *Id.* 402. Although relevant, evidence may be
27 excluded if its probative value is substantially outweighed by
28 the danger of unfair prejudice. *Id.* 403.

**39**

1    This case is wholly unlike *Cabrera.* Contrary to *Cabrera,*
2    the error is reviewed as plain error in this case because there
3    was no timely objection made to the testimony during trial.  A
4    curative admonition was given to a belated defense request made a
5    day later.  Also, the testimony by both informant Zayed and
6    agent Galvan is highly relevant to the roles and structure of the
7    pseudoephedrine trafficking organizations which, as the evidence
8    showed, they played in the transactions as dealings that led to
9    this case and how Mr. George got involved with Zayed through
10   family contacts in Chicago.  That roles in the transaction had
11   some relation to race and ethnicity was relevant to explain the
12   nature and structure of the transaction and how George, Shino,
13   and Nobari came to be involved and what their roles were to be.
14   In this case, race and the term "Mexican" were first raised by
15   Mr. Reyes, counsel for Defendant Zazueta.  RTP, April 19, 2005,
16   158:4-5.  The Defendants themselves referred to each other along
17   racial lines.  Throughout the trial, the jury was presented with
18   audio tape evidence of the drug transaction where co-Defendants
19   refer to each other in racial terms rather than by given names.
20   The testimony of informant Zayed and agent Galvan was necessary
21   to identify for the jury, why, and which Defendant was referred
22   to as "The Mexican" in the tapes submitted into evidence.  The
23   evidence at trial revealed that George referred to Zazueta as
24   "The Mexican."

25   There is no actual error in the testimonies of informant
26   Zayed and agent Galvan in referring to actual participants and
27   events that occurred in this case.  Any alleged error was not so
28   clear or prejudicial that it seriously affected the fairness of

**40**

1  any Defendants' trial.  Any conceivable negative innuendo did not

2  rise to the level of actual prejudice.  At the request of the

3  Defense, the court gave a limiting instruction reminding the jury

4  that the testimony was only to be considered as to specific

5  individuals in the context of the facts of this case, and not as

6  racial stereotyping or suggesting that any racial or ethnic group

7  had particular criminal proclivities.  The curative instruction,

8  coupled with the strong case presented against Defendants, was

9  sufficient to neutralize any potential prejudice that might have

10  arisen.

11  **b.  Eliciting Testimony from Government Witness
       Regarding His Veracity Because of Truthfulness of**

12  **Plea Agreements**

13  Defendant Zazueta argues in his brief that the Prosecutor

14  engaged in impermissible vouching by bringing up the following

15  line of questioning:

16  BY MS. ESCOBAR:
    Q. Now, what was the nature of your -- or

17  what was your understanding of the nature of
    the cooperation agreement in Phoenix?

18
    A. To testify against my co-defendants.

19
    Q. And in connection with your cooperation,

20  did the agreement indicate and did you agree
    to provide information and testimony that was

21  truthful, honest, candid and complete with no
    knowing material false statements or

22  omissions?

23  A. Yes.

24  Q. And in recommending a reduction, did the
    Assistant US Attorney -- the reduction was

25  based on your fulfillment of this agreement.

26  A. Yes.

27  Q. To provide truthful testimony.

28  A. Yes.

**41**

1

2   Q. And did the agreement, and your understanding of the agreement, indicate that you would neither attempt to protect any person or entity through false information or omissions nor falsely implicate any person or entity?

3

4   A. Yes.

5

6   Q. Based upon your fulfillment of the agreement, you received a reduction?

7   A. Yes.

8   Q. And did the agreement further provide that the determination of your assistance to the government would be decided solely by the United States Attorney for the District of Arizona and by him alone?

9

10

11   A. Yes.

12   Q. And as part of that process, the agreement indicated that it was the sole discretion of the United States. And that you would agree to submit to polygraph examinations to verify information. Was that correct?

13

14

15   A. Yes.

16   Q. So the reduction, again, at another point in the plea agreement, the US Attorney in its sole discretion, would move at the time of sentencing for a departure from the sentencing guidelines and impose a sentence below a level established by law as the minimum sentence to reflect your substantial assistance. Again, was it your understanding that the determination of your compliance with the cooperation agreement would be based solely on the Assistant US Attorney's evaluation of your compliance?

17

18

19

20

21

22

23   A. Yes.

24   RTP, April 28, 2005, 1106:25-1108:18.

25       This statement was not objected to and is reviewed under

26   plain error.  Defendant argues that such testimony implies that

27   the Government can guarantee a cooperating witness' truthfulness.

28   Defendant argues that it was impermissible to further distinguish

**42**

between the informant and Defendant George in inferring that the
informant witness had "come clean" and Defendant George had not.
This is untrue.  The Prosecutor correctly pointed out that the
informant's plea agreement required his testimony be truthful;
that the agreement was voidable if his testimony was false; and
that it was in the sole discretion of the Government to determine
if the informant's cooperation was substantial, i.e., valuable.
However, Defendant Zazueta fails to allege that such testimony is
a deviation from any legal rule so as to constitute "error" that
is plain, clear or obvious resulting in such prejudice to the
Defense that it seriously affected the integrity of the trial.
The explanations of the informant's cooperation (plea) agreement
were necessary to enable the jury to understand limits on the
informant.

**D.    Count Three Jury Instructions**

A party who objects to any portion of the jury instruction
or to a failure to give a requested instruction must inform the
court of the specific objection and the grounds for the objection
before the jury retires to deliberate.  Fed. R. Crim. P. 30(d).
The district court has substantial latitude in tailoring jury
instructions.  *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th
Cir. 2000).  Jury instructions must be formulated so that they
fairly and adequately cover the issues presented, correctly state
the law, and are not misleading.  *Id.*  If a defendant complies
with Rule 30 by properly objecting to an instruction, the
instruction is reviewed for abuse of discretion.  *See United
States v. Garcia,* 353 F.3d 788, 791-92 (9th Cir. 2003).  Where a
party fails to object, an allegedly erroneous jury instruction

**43**

1  will be reviewed for plain error.  *See United States v. Jimenez*

2  *Recio,* 371 F.3d 1093, 1099 (9th Cir. 2004).  Reversal under plain

3  error is appropriate only if the error is so highly prejudicial

4  that it affects a defendant's substantial right to a fair trial.

5  *See* Fed. R. Crim. P. 52(b).

6      The Defense makes several arguments regarding the jury

7  instruction pertaining to count three of the indictment charging

8  Defendants with possession of a firearm during and in relation to

9  a drug trafficking crime.  First, Defendants argue that the

10 Pinkerton instruction misstated the elements of count three.

11 Defendants also argue that, the elements of 18 U.S.C. § 924(c)[3]

12 were cross matched.  Lastly, Defendants argue that these mistakes

13 constituted an impermissible amendment of the indictment.  The

14 only objections to the jury instructions raised during trial were

15 to the giving of a Pinkerton instruction, not its form or

16 language.  RTP, April 29, 2005, 1304:18-1305:23.

17          **i.    The Pinkerton Instruction**

18     Because the Defense objected to the jury instruction on

19 Pinkerton liability, the instruction is reviewed for abuse of

20 discretion.  During trial the jury was given the following

21 instruction:

22              Before you may consider the statements
23              or acts of a co-conspirator, you must first
              determine whether the acts or statements were

24

25 [3] Section 924(c) provides:

26              "Any person who, during and in relation to
              any drug trafficking crime uses or carries a
27              firearm, or who in furtherance of any such
              crime possesses a firearm shall be subject to
28              a term of not less than five years."

**44**

made during the existence of and in furtherance of an unlawful scheme and whether any offense was one which could reasonably have been foreseen to be a necessary or a natural consequence of the unlawful agreement. Therefore, you may find a defendant guilty of possessing a firearm during and in relation to a drug trafficking crime, as Count Three of the indictment charges, if the government has proved each of the following elements beyond a reasonable doubt:

First, a person named in Count Three of the indictment committed the crime of possessing a firearm during and in relation to a drug trafficking crime. And that person was a member of the conspiracy charged in Count One of the indictment; and that person committed the crime of possessing a firearm during and in relation to a drug trafficking crime as alleged in Counts One and Two of the indictment in furtherance of the conspiracy. The defendant must also be found to have been a member of the same conspiracy at the time the offense charged in Count Three was committed and the offense must be within the scope of the unlawful agreement and it must have been reasonably foreseeable to be a necessary or natural consequence of the unlawful agreement. You must decide whether the conspiracy charged in the indictment existed. And if it did, who at least some of its members were. If you find that the conspiracy charge did not exist, then you must return a not guilty verdict even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty even though the defendant may have been a member of some other conspiracy.

RTP, April 29, 2005, 1323:3-1324:12.

Defense counsel argues that in this <u>Pinkerton</u> instruction the district court erroneously substituted the phrase "during and in relation to" for the required "in furtherance" element of the possession offense charged for the indictment. Defense argues that, as a result, the Government was held to a lower threshold of "during and in relation to" rather than having to meet the

**45**

1 higher burden of the "in furtherance" element.

2     For <u>Pinkerton</u> liability, jury instruction No. 20 was

3 patterned on the express language of the Ninth Circuit Model

4 Criminal Instructions § 8.20[4].  These instructions are formulated

5 to fairly and adequately cover the issues presented and correctly

6

7 _____

8     [4] Section 8.20 of The Ninth Circuit Model Criminal
Instruction provides:

9

10           Each member of the conspiracy is
          responsible for the actions of the other
11          conspirators performed during the course and
          in furtherance of the conspiracy. If one
12          member of a conspiracy commits a crime in
          furtherance of a conspiracy, the other
13          members have also, under the law, committed
          that crime.

14          Therefore, you may find the defendant
          guilty of [e.g., distributing cocaine] as
15          charged in Count _____of the indictment if
          the government has proved each of the
16          following elements beyond a reasonable doubt:
17               1. a person named in Count _____ of
                 the indictment committed the crime
18               of [e.g., distribution of cocaine]
                 as alleged in that count;
19               2. the person was a member of the
20               conspiracy charged in Count _____
                 of the indictment;
21               3. the person committed the crime of
22               [e.g., distribution of cocaine] in
                 furtherance of the conspiracy;
23               4. the defendant was a member of the
                 same conspiracy at the time the
24               offense charged in Count _____
                 was committed; and
25               5. the offense fell within the scope
26               of the unlawful agreement and could
                 reasonably have been foreseen to be
27               a necessary or natural consequence
                 of the unlawful agreement.

28

**46**

1   state the law.  The Defense fails to show that it was an abuse of

2   discretion to instruct the jury using the Ninth Circuit

3   instructions.

4   **ii.   Instruction for 18 U.S.C. §924(c) Was Given Pursuant to the Ninth Circuit Pattern of Criminal Jury Instruction**

5   **No. §8.65**

6       The Defense for Mr. Nobari next argues that the substantive

7   instruction on count three also cross matched the elements of

8   924(c) such that the Prosecution was relieved of proving every

9   element of the crime beyond a reasonable doubt.

10      During trial the following instruction was given to the

11  jury:

12          The defendants are charged in Count
            Three of the indictment with possessing a
13          firearm during and in relation to a drug
            trafficking crime in violation of United
14          States law.
                In order for a defendant to be found
15          guilty of that charge, the government must
            prove each of the following elements beyond a
16          reasonable doubt:
                First, the defendants committed the
17          crime of conspiring to aid and abet the
            manufacture of 50 grams or more of
18          methamphetamine and/or to possess
            pseudoephedrine knowing or having reasonable
19          cause to believe it would be used to
            manufacture methamphetamine as charged in
20          Count One of the indictment. Or that the
            defendant committed the crime of attempting
21          to possess pseudoephedrine, knowing or having
            reasonable cause to believe it would be used
22          to manufacture methamphetamine as charged in
            Count Two.
23              In other words, as I have said before
            and I'll say it again for clarity sake, you
24          have to find either that Count One or Two has
            been proved to get to Count Three because
25          Count Three is charged that the weapons were
            used or carried in the furtherance of a drug
26          offense.
                The second element of the possession of
27          a firearm in furtherance of a drug offense is
            that the defendant knowingly possessed a
28          firearm. And I've just defined "knowingly"

1               for you.

                  And third, the defendant possessed the

2               firearm during and in relation to the crime
               charged in Count One or Count Two or both, if

3               you find that both crimes were committed. A
               defendant takes action in relation to the

4               charged drug crimes if the firearm
               facilitates or plays a role in one or more of

5               the drug trafficking crimes charged.

6 RTP, April 29, 2005, 1325:20-1326:24.

7     Defense counsel for Mr. Nobari makes several arguments

8 regarding the language used in the instruction.[5]  First, the

9 Defense argues that the jury was not clearly instructed that it

10 must find the critical element of "in furtherance of" in the

11 present case.  Instead, the Defense claims that the court

12 instructed the jury that it should convict on count three if the

13 defendant possessed a gun "during and in relation to" which, they

14 argue, sets up a lower burden for the Government.  The Defense

15 also argues that the instruction was given without defining the

16 term "use" or "carry."  Lastly, the Defense argues that the

17 instruction for the 924(c) offense was an impermissible amendment

---

18

19     [5] In support of their argument, the Defense for Nobari cites
20 *United States v. Mann*, 389 F.3d 869 (9th Cir. 2004).  In *Mann,*
the court rejected the government's argument that because pen
21 guns (a small-caliber single shot weapon that resembles a
fountain pen) are inherently dangerous and generally lacking in
22 usefulness except for violent criminal purposes, possession of
such a weapon satisfies the "in furtherance of" element.  *Mann*,
23 389 F.3d at 880.  A case such as *Mann,* where the government
failed to show sufficient evidence that the gun was used to aid
24 or facilitate the commission of the drug trafficking, is
distinguishable from this case where there was ample evidence
25 against Defendants, that the firearms were carried to the drug
deal meet location and were in the actual possession of Zazueta
26 and at least the constructive possession of Nobari in the vehicle
George drove and at the ---- residence where he appeared to be
27 placing the pistol in his waistband.
28

1  of the indictment.

2     Because the Defense did not object to the 924(c) instruction

3  during trial, it is reviewed for plain error.  Reversal is

4  appropriate only if the error is so highly prejudicial that it

5  affects a defendant's substantial right.  *See* Fed. R. Crim. P.

6  52(b). The jury was instructed on the §924(c) offense in

7  accordance with Ninth Circuit Model Criminal Jury Instruction

8  §8.65[6].  Upon instructing the jury on the §924(c) offense,  a

9

10     [6] Ninth Circuit Model Criminal Jury Instruction §8.65

11  provides:

12     The defendant is charged in [Count Three of]
       the indictment with [using] [carrying]

13     [possessing] [brandishing] [discharging] a
       firearm during and in relation to a [drug

14     trafficking crime] in violation of Section
       924(c) of Title 18 of the United States Code.

15     In order for the defendant to be found guilty
       of that charge, the government must prove

16     each of the following elements beyond a
       reasonable doubt:

17

18     First, the defendant committed the crime of
       [*e.g.*, murder] [as charged in Count ____ of

19     the indictment];

20     Second, the defendant knowingly [used]
       [carried] [possessed] [brandished]

21     [discharged] a [*firearm*]; and

22     Third, the defendant [used] [carried]
       [possessed] [brandished] [discharged] the

23     [*firearm*] during and in relation to the crime.

24     [A defendant has "used" a firearm if he or

25     she has actively employed the firearm in
       relation to [*crime charged*].] [Use includes

26     any of the following:

27     (1) [[brandishing] [displaying] [bartering]

28     [striking with] [firing or attempting to

**49**

1   portion of the charge contained in count three had different

2   language.  RTP, April 29, 2005, 1325:20-1326:24.  However, the

3   language was corrected by the court with the following

4   clarification to the jury:

5              In other words, as I have said before and
               I'll say it again for clarity sake, you have
6              to find either that Count One or Two has been
               proved to get to Count Three because Count
7              Three is charged that the weapons were used
               or carried in the furtherance of a drug
8              offense.

9   RTP, April 29, 2005,1326:10-14.  The brief difference in

10  terminology cannot be material or prejudicial where the jury was

11  expressly told the use or carrying of the firearm was in the

12  furtherance of a drug trafficking offense.  The clarification was

13  sufficient.  The Ninth Circuit Model Criminal Jury Instructions

14  are clear and unambiguous.  <u>Pinkerton</u> has been an approved jury

15  _____

16            fire] a firearm;]

17            (2) [referring to a firearm in the offender's
              possession [in order to bring about a change
18            in the circumstances of the predicate offense];]

19            (3) [the silent but obvious and forceful
20            presence of a firearm in plain view].]

21            A defendant carries a firearm if the
              defendant knowingly possesses or carries the
22            firearm. Carrying is not limited to carrying
              weapons directly on the person, but can
23            include circumstances such as carrying in a
24            vehicle or a locked compartment of a vehicle.

25            A defendant takes such action "in relation to
              the crime" if the firearm facilitated or
26            played a role in the crime.

27

28

1   instruction since 1946. *Pinkerton v. United States*, 328 U.S.

2   640, 647 (1946).  Under a <u>Pinkerton</u> theory of liability a co

3   conspirator may be charged with the use or carrying of a firearm

4   during a drug crime. *See, United States v. Alvarez-Valenzuela*,

5   231 F.3d 1198, 1203 (9th Cir. 2000).  There was no instructional

6   error so highly prejudicial in the §924(c) instruction that

7   warrants reversal in this case.

8   **E.   Court's Failure to Give a Specific Unanimity Instruction**

9        The Defense argues that it was an abuse of discretion and a

10  violation of Nobari's constitutional rights to give the jury a

11  general, rather than a specific, unanimity instruction for the

12  §924(c) offense.  An instruction that was reasonably likely to

13  have been misunderstood by the jury is subject to harmless error

14  analysis. *Murtishaw v. Woodford,* 255 F.3d 926, 973 (9th Cir.

15  2001)(*citing Calderon v. Coleman,* 525 U.S. 141, 145 (1998), which

16  held that jury instructions that were constitutionally erroneous

17  are reviewed under harmless error analysis.)  A constitutional

18  error in jury instructions is reversible if it is harmless beyond

19  a reasonable doubt that a rational jury would have found the

20  defendant not guilty absent the error. *United States v. Munoz,*

21  412 F.3d 1043, 1047 (9th Cir. 2005).

22       Defense counsel argues that the court was required to give a

23  unanimity instruction in this case because there was a genuine

24  possibility of jury confusion.  The Defendants reliance on *United*

25  *States v. Southwell*, 432 F.3d 1050 (9th Cir. 2005), in support of

26  their argument is misplaced.  In *Southwell,* the district court

27  failed to instruct the jury on whether they were required to

28  reach a unanimous decision on defendant's insanity before

**51**

1    considering guilt or innocence.  During deliberations, the jury
2    sent a note to the court indicating that it was unclear on what
3    to do if the jurors could not agree unanimously on the issue of
4    insanity.  *Southwell*, 432 F.3d at 1052.  Rather than address the
5    jurors' confusion, over Defense counsel's objections the court
6    advised the jury to use their "best recollection" of the evidence
7    and the instruction.  *Id.*  The Ninth Circuit found this response
8    to be inadequate by reasoning that the court abused its
9    discretion when failing to answer a jury's question on a matter
10   that is not fairly resolved by the jury instruction.  *Id.* at
11   1053.  However, the court failed to decide whether the original
12   instructions were deficient and rendered their ruling entirely on
13   the inadequacy of the jury's response.  *Id.* at n.1.

14        In the ordinary case, a general instruction that the jury's
15   verdict must be unanimous will be sufficient.  *Jazzabi v.*
16   *Allstate Ins. Co.,* 278 F.3d 979, 986 (9th Cir. 2002).  There is
17   no indication of jury confusion in this case.  None of the jurors
18   expressed any doubt or misunderstanding regarding the
19   instructions they were given.  There is also no evidence that
20   Defense counsel requested a specific unanimity instruction during
21   trial.  The jury in this case was instructed according to the
22   Ninth Circuit's jury instruction guidelines, in the following
23   manner:

24              "Your verdict, whether guilty or not guilty
                on each of the three counts, must be
25              unanimous."

26   RTP, May 3, 2005, 1472:12-13; *see also* Ninth Circuit Model
27   Criminal Instructions. 7.1 - Duty to Deliberate (2006 ed.).  The
28   jury was also advised that they were required to reach a

**52**

1  "unanimous agreement on the issues that have been submitted to

2  you to decide."  RTP, May 3, 2005, 1475:6-7.  The instructions

3  were unambiguous.  The verdict forms also contained the finding

4  that a unanimous verdict had to be reached in every finding as

5  the separate verdict forms as to each Defendant.  The jury was

6  individually polled at the time the verdicts were returned in

7  open court to assure unanimity.  Absent any evidence of jury

8  confusion abuse of discretion cannot be found where the jury was

9  instructed pursuant to the Ninth Circuit Model Criminal

10 Instructions.

11                    **VI.   CONCLUSION**

12      All the reasons stated within court on June 9, 2006, at the

13 hearing of Defendants' motions for new trial are incorporated by

14 this reference and made a part of the decision.  Defendants'

15 motions for new trial are **DENIED.**

16

17 **SO ORDERED.**

18

19 Dated: August 30, 2006            /s/ OLIVER W. WANGER

20                              **OLIVER W. WANGER**
                             **United States District Judge**

21

22

23

24

25

26

27

28

                              **53**